We'll hear from Mr. West. Good afternoon, your honors. May it please the court, my name is Zach West. Can you pull it up even a little higher? Yes, your honor. Thank you.  May it please the court, my name is Zach West. I represent the state of Oklahoma and the Oklahoma Attorney General in this matter. And with me at council table are Mr. Tom Hillis and Mr. Miles McFadden, as well as Mr. A.J. Ferrati. I would like to reserve two minutes of my time for rebuttal. Certainly. Very soon the federal government will deny Oklahoma $4.5 million in funding for the next year in Title X, funding that Oklahoma would use to serve, as it has for 40 years, the most vulnerable and hard to reach people in Oklahoma. Solely because Oklahoma, since Dobbs, has refused to perform or provide abortion referrals and counseling. This court should reverse the district court and grant a preliminary injunction because that decision is unlawful for three reasons, or at least Oklahoma believes it is likely to succeed for three reasons. First, because the Weldon Amendment protects those who decline to refer for abortions, including entities and health care entities, and as does the defendant's 2021 rule. Second, because the spending clause requires that such conditions be unambiguous and rust requires an ambiguity finding. And third, because the government acted arbitrarily and capriciously, among other things, in ignoring Weldon, Dobbs, and its own rules and regulations. I want to start actually with Weldon, especially given the expedited nature of this case. We believe it may be helpful to point the court to what is perhaps the most narrow or expeditious way to resolve the case, and that to us is maybe the Weldon Amendment. Now, simple isn't everything. We have to be likely to succeed. But we believe Weldon is fairly straightforward on that front. As the Oklahoma Health Department has now argued for nearly a year, it qualifies for protection under the Weldon Amendment on multiple textual levels, none of which has been refuted by defendants. The first is the text of the Weldon Amendment itself, which protects from discrimination any institutional health care entity. And we would posit that all of those terms apply to the state health department. When institutions of health care are defined, it looks like they're people who actually have the hands-on provision of health care, and Oklahoma doesn't meet that test. So I've read your briefs, and I know your argument there that you're enabling and people in the state government are acting on your behalf, but I'm a little agnostic about that. No, that's fair, Your Honor. The two things I would say in response to that are, first, the Weldon definition, and that's kind of the second level we were going to go to, is the Weldon definition of what an institutional or health care entity is says, among other things, it can be any other kind of health care organization. And I believe you've gone kind of maybe to the word health care of saying, well, that implies provider. Well, first we would say that doesn't necessarily imply a provider as much as it would be passing strange to say a state health department does not qualify as a health care organization. But nevertheless, on your second point, the state health department provides numerous health care services under Title X. We've pointed to several places in the record, especially in the defendant's own 2016 review, where they acknowledge that. Does that bind them for the interpretation here? I'm not sure. I'm not sure I follow. Well, you say that they have included under health care entities, the state of Oklahoma, or at least not requiring them to be providers in other situations. I'm wondering if that binds them in this case. I'm not sure it binds. It depends on which one you're referring to. We've referred to in the 2021 rule, they explicitly say twice that grantees will be protected. And it is undeniable that the Oklahoma Health Department is a grantee. And that is stated twice. Now, we will admit that is, I believe, preamble language. And preamble language is persuasive or helps in interpretation, but is not officially binding. If what you're also referring to is my comment that the 2016 review that they did also indicates that the Oklahoma Health Department is a provider of services, because it is, that we would argue probably should be binding. Is it absolutely binding that they acknowledge that in 2016? I don't know. But to give one example, we've cited a couple in our briefs. I want to cite to another example in Appendix Volume 2, page 253. It's very clear. It says the grantee, which is OSDH, quote, is providing comprehensive family planning services, including breast and cervical cancer screening. That's on, again, Appendix Volume 2 at 253. That's one of several places in their own 2016 review that acknowledge what we know, because we're Oklahoma and we run the Health Department, which is the Health Department provides on the ground services in partnership with the county health department. Counselor, can I better understand that? Are you saying that there are State Department of Health physicians, medical workers who are doing direct patient contact and care? Yes, Your Honor. I noticed that was pled in your complaint and you discussed other things such as referral for other services and particularly rural counties. Yes. I just wanted to crystallize this point. So the State Department of Health working with the county or local health departments in some of these rural counties are the, maybe the only place where some low-income Oklahomans can go for care. Yes, Your Honor. So it's a facility and the caregivers themselves work under the umbrella of the Department of Health. That is correct. And it is a partnership. Now, it's a little bit different with a couple of counties in Oklahoma. There's the Oklahoma County and Tulsa County health departments are a little bit more of a contractual, you know, there's a little more distance between the health department and those two entities. But the other, I think it's 68 health departments at least. The health department literally sends its own workers into those departments, its own APRNs, its own RNs to do services. And Tina Johnson, it doesn't, that what I just said is not explicit in her affidavit. One interesting note where it kind of shows that in her affidavit, it's the one affidavit we provided is in paragraph three of her affidavit, it talks about her jobs that she's held with OSDH. And one of those jobs, one of the very first ones she had was a public health nurse in Oak Fuskie County, in another county that I can't remember the name of, but in rural counties, like one of her health department jobs was I was a nurse for this county. I went to this county. And so we would posit, again, on those kind of three textual levels, including their own 2021 rule as a grantee, that the health department qualifies as a health care entity that is protected by Weldon or should be protected by Weldon. I don't want to, did you have a question? No, go ahead. The, I wanted to ask you, assume for purposes of my question, that the Oklahoma State Department of Health is an institutional health care entity. Yes. I am not sure that I agree with either you or your adversary on how this Weldon Amendment applies. Now, number one, you said the Department of Health, and I agree with you, is the grantee, not the state. So the introductory clause refers to the fact that no HHS funds, including Title 10 funds, can be made available to a federal program, a federal agency, a state or a local government. Okay, now those are the grantees. We don't have that situation, right? The state, none of those entities are a grantee. We have a State Department of Health, which is the grantee, correct? Correct. All right. And so I assume that I can't discriminate against myself. An entity cannot subject myself to discrimination, obviously, right? And so, do you agree with that? Not entirely. Do you think Bob Bacharach can say, Bob, you're discriminating. No, that doesn't make any sense. So the verb is subject, the object is discrimination. I'm not trying to argue with you, but I think you might have misunderstood my question, because I think it's probably nobody on the planet would disagree that I cannot subject myself to discrimination. No, that's correct. I was going to add a caveat to that of saying the state could discriminate against the State Health Department. All right. Well, there you go. So let's say, so that would be your argument. So that the state, now that, of course, is a hypothetical that you just mentioned, because as you just mentioned, the state is not a grantee. The Department of Health is the grantee. So several part questions. One is, if that hypothetical scenario that you just mentioned is right, that's hypothetical, right? The State Department of Health is not a grantee. So even if the Department of Health is an institutional health care entity, they are not subjecting anybody to discrimination for the refusal to provide coverage for the referral of abortions. Okay. Right? I'm not entirely sure I followed that, because I thought I heard you say the State Department of Health is not a grantee, and our position would be that it is a grantee. So the Department of Health, no, I said exactly the opposite of what you said. Yeah, and that's what I just misunderstood. I meant to say the Department of Health is the grantee, not the State of Oklahoma. Okay, yes. Correct? Okay, so the way that this works is if the state is the grantee, it can't discriminate against this agency, the Department of Health, for the Department of Health's refusal to provide coverage for the referral of abortions. Is that happening? I think here we would say it's... The State of Oklahoma isn't even a grantee. But what we're pointing to here is to say no funds may be made available in this act to a federal agency or to a state or local government if such agency, so a federal agency, subjects any individual or institutional health care entity to discrimination. Okay. What we're positing is that. Okay, so I'm with you. So let's say you have a challenge to Title X. You have a challenge saying federal government, you shouldn't be funding HHS because they are subjecting an institutional health care entity, i.e., the Department of Health, to discrimination based on its refusal to provide coverage for the referral of abortions. So that seems like a really good argument if you were to say, I want to have a citizen sued against Congress. I want to challenge the whole Title X program because it is providing coverage to the Department of Health, I guess the way your argument would work. Or I guess your argument is that the federal government is providing funding to HHS and HHS is subjecting the institutional health care entity to discrimination. Correct. Refusal to provide coverage for referral for abortions. So all that would be a great challenge for a citizen sued to the whole structure of Title X. But you're not doing that. Well, because we've brought an AP, that's what we've nestled, our Weldon claim is actually nestled within the broader APA claim, which is we've said because of the fact that this is an appropriations rider, we have brought the Weldon Amendment in saying that under the APA, the federal government cannot issue and apply regulations in violation of federal statutes and federal law, and that they're doing that as a violation of the APA by simply ignoring a clear prerogative to their federal agency. You cannot discriminate against entities, health care entities. But the remedy would be the statute has to be abrogated. What you're taking is a fundamental challenge to the structure of a federal grant program and saying, well, okay, we're not challenging Title X. Again, we're saying that we want that violation to be overlooked because we want that HHS money, even though the federal government has completely violated this rider, but we want to say, well, but we want to use it for a completely different purpose. We want to assume that the structure remains intact, and we're going to say, well, it would be arbitrary to allow coverage, I mean to deny coverage to the Department of Health, when the whole import of the statute is not a condition on the applicability of the HHS grant program. The challenge is actually to the whole existence of Title X. Respectfully, we would just disagree. We think this is a quintessential as-applied challenge of saying under the APA, there are statutes that they have to follow, there is their own 2021 language that they should follow, protecting grantees that they're simply not doing, and that this Court under Weldon could rule in that direction without affecting the 2021 rule, could stay in place entirely and just say that we're holding you to your own promises and Weldon's statutory promise to objectors. You're getting half two minutes for rebuttals. What I wanted to wrap up with was the spending clause, is moving to the spending clause to simply say that the core syllogism or tautology that's at the center of the spending clause, we don't believe defendants have ever really answered between Penhurst saying, along with a number of other cases, that conditions must be unambiguous, and Rust's finding that this specific condition is ambiguous, that those are two binding Supreme Court decisions that require a finding in our favor that defendants have never fully wrestled with. Thank you. Well, don't leave. Okay, yes. Colleagues, you can ask whatever questions you'd like. And you'll have two minutes. Did you say you wanted to preserve two minutes for rebuttal? We did. We would like to preserve two minutes for rebuttal. I'm happy to wrap up. If there are any spending clause questions, including on the reason that they're positing now, which is that there's supposedly a clear spending condition that's kind of generic that just allows them to do this, I'm happy to answer those questions. Okay. Well, I appreciate that. I'm sorry. So what's your time? Judge Abell, do you have any questions? No. Mr. Federico? Well, I'm sorry. I have a question about the spending clause. Yes, Your Honor. So what you say is that under U.S. versus BASC, there has to be a clear statement because it impacts federalism. They say, well, it doesn't impact federalism because all they have to do is to die on the subsidy. But let's just put that aside. Assuming that there has to be clarity in what Congress says, HHS says, well, Title X does that. In, what is it, 304.A, it says that eligibility for the grant is predicated on complying with the conditions that HHS sets. And you're saying, and you say in your reply brief, well, that's not good enough because you still have to look to the statute. So my question is, what if in 304.A-HB of Title 42, Congress said, we are incorporating herein the eligibility requirements that are set forth in the 2021 rule. Would, under that scenario, would Congress have spoken with adequate clarity, a lack of ambiguity in order to satisfy Pennhurst, the Pennhurst requirement? I believe the answer to that would be yes. If they've expressly incorporated and said, we are incorporating these conditions. And I think that's happened in the past case, even. One of the cases that's been cited here is, has something similar. It happens where there were regulations first and then Congress came in and said, we basically are taking those regulations and putting them into statute. We think that would, yes, that would be clear. But that is not what has happened here. So what if Congress in 304.A-B says, to satisfy the eligibility requirement, you have to satisfy HHS's requirements administratively adopted for eligibility. Does that speak, did it technically say, like a complaint does, you know, I incorporate therein, but it specifically said basically the substantive equivalent. If it is, sorry, Your Honor, I didn't mean to interrupt. If it is specifically citing to requirements that are themselves clear, then I would think the answer would be yes. In other words, if they've incorporated or made part of the statutory scheme requirements that you could go and say, those are clear. I see, you know, this HHS requirement that's been incorporated expressly is a clear requirement that I can understand. Then I would think yes. Now the one caveat I might give to that is, I would think that would apply only to the regulations at the time that Congress passed that language. Because say HHS then a year later added another regulation that had not been incorporated and said, oh, we're going to impose that condition on you too. I think a state would have a very valid objection. What if Congress said you have to, eligibility is contingent on the HHS eligibility requirements that are in place at the time of the grant application? Then I think then you start to run into problems if you have an indefinite incorporation of future rulemaking. I think then you run straight into a non-delegation problem of saying. A non-delegation problem, but you're not challenging this based on a lack of delegation. No, but one of our arguments is, is that if this is interpreted in the way that the government is insisting it should be interpreted, then you would run into a non-delegation problem. And that we should interpret statutes to avoid constitutional issues. And that a basically here, using the statute that they're using, which is a very generic rulemaking statute, and saying that means that essentially the spending clause is null and void and they can do whatever they want and not violate the spending clause. That that is a big problem under delegation then. And it eviscerates the spending clause, which is very dangerous saying that the spending clause now all Congress has to ever do is put into its statute that you can impose whatever conditions you want. And then the spending clause is not a thing anymore. We think that would eviscerate the spending clause. And I don't, in looking at the spending clause history from Pennhurst to Dole to Arlington in 2005 to Cummings in 2022, where they've consistently said Congress must be unambiguous. We don't think that that case law somehow impliedly said, but if Congress says that any condition you want can be passed, that means that you're good. Any spending clause legislation that it's just they can impose whatever they want. We're not clear where the limiting principle is. Under their theory, it would seem that they could impose actually the performance of abortions on states. If any condition flies, any condition goes, where is the limit? I, we haven't seen it. We haven't seen them articulate a limiting principle and they certainly haven't cited a case where a court said that language means yes, the spending clause is abrogated. Well, wouldn't the answer, wouldn't his answer obviously be, well, that satisfies article one, section eight. It's, it's a valid exercise of the spending power, but it also violates the statute, violates statute 1008. I mean, A, I don't think they would concede that that violates 1008, but I think that it's still. Well, it doesn't have any, your argument doesn't have anything to do with the validity of the statute under the spending power. I think it does. It's saying that if their argument is accepted, the spending clause forever and forevermore will never be a thing that a court could ever consider. And for 40 years now, both district courts, circuit courts, and the Supreme court have routinely entertained spending clause challenges and occasionally ruled in favor of the spending clause challenges like the district of Colorado did just a couple of years ago, like the Supreme court did in Arlington, which may be the closest case to what we're arguing for. In Arlington in 2005, the Supreme court said two things need to be analyzed for a spending clause challenge. It said one, the statutory text. And then from statutory text, it moved on and said to case law. We look at statutory text in case law to see if this condition is clear. And the statutory text here in our case is, has been held in rust to be ambiguous. So that part is resolved. And then you go to case law and that's rust. Rust has said title 10 does not mention or discuss referrals. It's a binding holding that it is ambiguous. You have authority that the delegate non-delegation clause has as much vitality in a spending clause challenge as it has in regulatory legislation. I'm not entirely sure I followed the question. We know what non-delegation clause prohibits. Yes. It typically arises in regulatory actions where the government is acting as a policeman regulating things. And you need to know what is going to be regulated of my conduct and what isn't. A spending clause case isn't really a regulatory case so much as it is something the government is giving to people and it's contractual in nature. So my question is, is that doctrine of non-delegation, does it have the same vitality in a spending clause case as it has in other cases? My inclination is it might not, but I admit I have no law. I haven't researched it. I'm not sure I have a case off the top of my head that addresses that directly. I guess what we would say is that, and this is why we haven't really focused on the non-delegation clause much because our only bringing it up was just to say, we think if you interpret the spending clauses this way, you might create non-delegation issues, but we focused on the specific spending clause text. I was just going to say, I was just wondering if you had a case on it. I didn't need a big exposition of it because we've allowed your time to go on. And the answer is no, you don't have a case on it. You haven't thought about it much, nor have I until now. And I don't have a case. So that's the end of the discussion. You and I are on the exact same plane at the moment. That's fair. I think the only thing I would just briefly add on the spending clause is that yes, some of the spending clause cases have not involved necessarily regulations, but it would just seem logical that if, you know, if Congress can't do it through ambiguous language, then surely the agency can't do it either. In other words, if you take those same cases and you invent them. I'm not drawing a distinction between Congress and an agency, but I'm drawing a distinction between regulations, which uses governmental power and spending cases, which are contractual in nature. But anyway, I think that's enough for now. That's good. And that's a fair question, Your Honor. Counselor, can I go back to the Weldon Amendment? Yes. For purposes of thinking about what is discrimination potentially under the Weldon Amendment, does an objector have to do anything to sort of prove or justify their objection or just simply making it enough? And once that is made, regardless of whether it's meritorious or not, then that constitutes or could constitute discrimination under the Weldon Amendment. Good question, Your Honor. Our view is that Weldon doesn't say, it doesn't cabinet on, it has to be a conscientious moral objection or doesn't cabinet on, it has to be a sincere objection. I mean, maybe you could implicitly read that, or we think ours is perfectly sincere. But yes, our view is that the Weldon Amendment is basically completely unconcerned with the reason why, as much as just saying you don't discriminate against those who refuse. And here, Oklahoma's health department has refused and has cited the Weldon Amendment again, for the first time, almost a year ago to the health department or to the, sorry, to HHS, to the federal health department. Okay. And I should add really quickly, because I need to get to this earlier, is that we do want to make one correction to the record, which is we had said in our reply brief that there was no administrative ruling on our administrative appeal yet. And actually that was incorrect. That ruling came in the week before our reply was due and due to just a bureaucratic misunderstanding, we got the wrong information that that ruling had not come in. There has been an administrative ruling now, and we will file that with the court, either us, the government or both at some point here very soon. But we were just alerted to that yesterday. So I wanted to correct our record that there is an administrative ruling and it is a denial of Oklahoma health department's claim. Okay. Well, I appreciate you letting us know about that. The only thing I would ask the council to confer is just make sure you're in agreement about what you submit. We don't want to hear argument about it or read about argument about it, but that wouldn't be good for us to get. Yes. And that was our assumption and we'll work with opposing counsel. All right. Thank you. Thank you. And we will give you two minutes for rebuttal. Thank you. Good afternoon, your honors. And may it please the court. Brian Springer on behalf of the federal government. I'd just like to take a step back and talk about what's at issue here. The regulatory requirements in this case apply only to family planning projects established with title 10 funds. And all that the regulations require is that the title 10 project offer pregnant patients information about their various options like foster care, adoption, and pregnancy termination, as well as information about where to obtain a service if the patient so requests. The title 10 project can fulfill these obligations by providing a 1-800 number to pregnant patients where hotline operators will discuss the various options. If Oklahoma no longer wishes to comply with these valid conditions attached to the federal funds, it's free to decline the funds, and HHS will grant, make grant awards to other entities. I'm curious, but you're saying, well, we refer to an 800 number, so our problem is solved. But if you couldn't overtly advocate something like an abortion, can you get around that by saying, call this 800 number, let them do the advocacy for us? Is that really a safe harbor for you that you're referring to a third party? I think that this, in general, is exactly what doctors do. What the rule requires is just to provide information about the various options. It's neutral factual information. It's not directing the patient toward one option over another. Did you provide an 800 number for a group that says don't do it? What do you get from this 800 number? Is it an advocacy number? No, it's not, Your Honor. It's the same type of non-directive counseling and referral that would be provided by the provider, the doctor, him or herself. Nobody challenges that. Everybody agrees that the advocacy number is itself non-advocacy. I mean, the 1-800 number is a non-advocacy group. Your Honor, my understanding is there's no dispute about that. This would just be providing that, serving in that role. That's enough for me. Thank you. Yeah. Answers my question. Thank you, Your Honor. Counsel, why wasn't your website sufficient? Meaning, when I looked at the negotiations between the state and HHS, when Oklahoma flagged this issue saying we may have compliance problems because of local law and policy, how about we just give the HHS website as a sort of means of referral, HHS said, nope, it has to be a 1-800 number. And then ever since then, even though you've argued in your brief that you were engaging with Oklahoma to try to work out a resolution, that seemed pretty one-sided. It seemed like you said, here's your option, either you take it or you don't take our grant. So it was kind of left out there. Why was the website insufficient? Your Honor, I don't know the specifics of exactly why that was rejected. I believe that the thought was that that was sort of too many steps away, the provision of information. This is someone who's going into their doctor and saying, I'd like to have more information about my options. I'm pregnant and I would like to have more information. And so what the rule requires is that the provider actually give them that neutral factual information, and if the patient says, oh, I'd like to obtain this service or this service, you hand them the name, address, and phone number. And I would just note as well that in the back and forth with Oklahoma, Oklahoma initially agreed to have its providers either specifically give the phone number to pregnant patients. And on that understanding, HHS made a continuation award, and then as soon as it had made that award, Oklahoma decided that it wasn't going to do what it had said it was going to do. Yeah, and, you know, that can be read in your brief to essentially say, well, they were negotiating in good faith, so to speak, about what they were intending to do. But another way to look at it is this was a real difficult conundrum for providers in Oklahoma trying to navigate, you know, a new state law that triggered post-obs and figuring out what the limits of that may be and being maybe somewhat cautious of their approach. And so I guess, again, as I read your brief, at least that occurred to me that that could be an interpretation. But how do you respond to my characterization as we do our analysis under what may be arbitrary and capricious response by HHS that HHS really wasn't negotiating? They said, here's what you have to do to comply, either to take our money or not. Gianna, you know, I don't think that the negotiation itself is something that's required by HHS. HHS works with its partners in this program to try to find solutions that will meet the regulatory requirements. And here, Oklahoma came back with a proposal that HHS thought didn't meet its regulatory requirements and said, you know, you can come back with an alternative. Here are some examples of things you can come back with. And originally, Oklahoma came back with one that satisfied HHS and allowed it to grant an award. So there was this back and forth that happens. But at the end of the day, of course, Oklahoma is required to follow these program requirements if it wants to continue to receive the Title X funding and must, you know, structure its program in a way that actually complies with those requirements. I'm happy to turn to, you know, whatever other issues would be helpful to turn to. You talk about whatever you want to talk about. We'll stop if you have a question. So I'm happy to turn to maybe it would be helpful to also turn to the spending clause and talk a little bit about the spending clause. You know, I think one, the thing that's really important to understand here is that the spending clause cases are all about notice. The question is whether or not there's notice in the statute that tells the recipients of funds what they're required to do. And here we have a very clear directive from Congress that all of the Title X grants are subject to the regulations and conditions that HHS puts on them. The Supreme Court itself has said in cases like Bennett and in cases like South Dakota v. Dole, that Congress is allowed to say that recipients of funds have to comply with agency regulations and requirements. That's all true. But Bennett, the only time I think that the word spending clause is used in Bennett is in Thompson Reuters' syllabus at the start of Bennett. Bennett doesn't discuss the spending clause. You mentioned Missouri v. Biden. Well, as you point out, the parties did brief the spending clause. The problem is the per curia of opinion that the Supreme Court issued says there's nothing about the spending clause or even the substance of the argument under the spending clause. Jackson is, you know, I think the Center for Constitutional Accountability mentions Jackson. I don't think Jackson addresses the spending clause. Your argument seems to, I mean, it makes logical sense to me, but I don't know that you've cited a case that says that Congress speaks with adequate clarity under Pennhurst when it directs eligibility, when it directs an applicant for a grant to comply with regulatory requirements that are set forth by an agency. They have argued under Pennhurst that, well, you just read the cases, and it says that Congress has to speak with adequate clarity. It doesn't say anything about agencies speaking with adequate clarity. So how do we credit your argument without any authority? So, Your Honor, I want to give two different responses to that. So the first response is I would urge the Court to look at South Dakota v. Dole, which I do think is a case about the spending clause and has language that specifically says that Congress can attach conditions based on federal statutes and agency, I think it says regulations. So I do think that there is authority. I mean, I think all of the cases that you've mentioned do support us. And I would also just mention Biden v. Missouri is an example where the Supreme Court, throughout its opinion, made very clear that it was talking about conditions that are attached to Medicare and Medicaid funding. Don't lose your train of thought. I'm sorry. But the whole point of that discussion was saying that those regulations fall within the domain of the statute. The regulations are not invalid because they fell within the domain of the statute. That's not their argument. But, Your Honor, I think that the reasoning would apply here as well, because the regulations that we have at issue here similarly fall within, you know, the realm of the statute. And the Supreme Court had no problem, even though the states there raised the exact same arguments that the states raised here, it didn't find a problem with HHS in that case, including a COVID-19 vaccination requirement for nurses who are working at federally funded hospitals. So, I mean, I think that the reasoning carries over to this situation. And, of course, these, you know, the conditions in Medicare, Medicaid, and all kinds of federal spending programs, you know, these are very commonplace conditions that agencies add and that Congress in its statute says that agencies are allowed to impose and that recipients of the funds are required to follow. And I think that's what the Supreme Court recognized in Biden v. Missouri. And as we mentioned, there's some discussion of this in Bennett and South Dakota v. Joel and these other cases as well. Okay. Thanks, Your Honor. As I said, I'm happy to turn to anything else. Counsel, can I ask you about the Weldon Amendment argument? Sure, Your Honor. First, do you agree that it's really purely a textual analysis, meaning I don't see any cases cited by the parties that help us understand how the terms of the Weldon Amendment are defined? There's some references to regulations, but I guess my takeaway from the briefs is this really is an argument, it's a matter of first impression. I mean, do you agree with that? Sure, Your Honor. There have not been a lot of cases about this because these objections are sort of a new thing. As HHS said in its rule, from 1993 to 2017, it had basically never had an objection under the Weldon Amendment. So these are sort of a new creature that is just starting to kind of come into form. Okay. So that leads into my next question, which is I understand your argument to say that the Weldon Amendment, this annual appropriations rider has, you know, walked side by side with the referral requirement regulation for many years, decades. So, you know, there's really no harm here. No one's raised an objection before. But why shouldn't we be skeptical of that history? Because the landscape that underlies all of it changed so dramatically in June of 2022, meaning the rule was in place. But when HHS looked at how to evaluate potential objectors in the Weldon Amendment discrimination provision post-Dobbs, does that history, is it meaningless at this point? Your Honor, I mean, I don't think that the history is meaningless. You know, I think the right way to be thinking about this is that what sort of the way everyone has been treating the Weldon Amendment for a long time is that, and this is true if you look at its text as well, that it focuses on individual doctors, facilities, and organizations that are providing the medical care or the medical coverage. And I think here, Oklahoma and its State Department of Health are not serving in that role. You know, they say, for example, at pages 35 and 36 of their opening brief, that they're the ones who are overseeing the program and dispersing funds to the units who are actually providing the on-the-ground, you know, medical care. And I don't think that, you know, those entities are the ones that are listed in the statute who are the ones who can object. And that's the way that this has been understood for a long time, which is why Oklahoma and a coalition of states just said in the Parallel Ohio litigation that states aren't covered by the Weldon Amendment, although it may be the case that individual, you know, state employees and doctors would be able to object in certain circumstances. You certainly hint at a preclusion argument in your response, but is that the government's position that either through means of estoppel or preclusion that Oklahoma has attached itself to one position before the Sixth Circuit? And then that disavows their opportunity to change their position here? Your Honor, it may be questionable whether or not, you know, their formal preclusion or estoppel applies. But here the question is whether or not Oklahoma is allowed to get equitable relief. And I think it's appropriate to consider what Oklahoma said in a way that it raised the arguments in this case. We actually have a slightly different rule for litigants who take different positions in different cases from the regular res judicata rules, don't we? On res judicata, you know, we ask, was it decisive? And was there a final verdict and all? But we also look at scans that people that tell one court, here's what the law is, and then next day they tell another court the law is different. Don't we have some accountability for that kind of change in the positions? Your Honor, I think that we do. There are doctrines that talk about that, particularly the doctrine of estoppel. And again, it may be that sort of the form... It's just under the concept of judicial estoppel. You make a statement to a judge or a court, and then you're kind of stopped from taking a different position. But maybe it's to it only that estoppel may only apply to the same judge. I don't know. The same court. Your Honor, I think that estoppel may be able to apply more broadly. But again, I mean, I don't think that the court needs to get into this, especially because right now all we're talking about is a preliminary injunction. We're talking about equitable relief. And I think it was appropriate both for the district court to consider the circumstances of Oklahoma sort of changing positions as well as, you know, in deciding whether or not to grant a preliminary injunction to Oklahoma. One of the problems of estoppel is if you use it as a formal doctrine, you need a final judgment. And we don't have a final judgment in that case yet. Your Honor, I think that's true of issue preclusion, the preclusion doctrines. It may not be true always, at least as to estoppel. But again, I don't think that the court has to get into this. That's what I was kind of asking. Does it apply? Your Honor, we haven't argued that it specifically applies in this case. But again, I mean, I think that the court has the ability to look at this because we're talking about equitable relief. And this is something that can influence whether or not Oklahoma should get a preliminary injunction. And we think that it shouldn't. Can I ask you just the same question that I had asked your adversary about the way that the Wellman Amendment works? I mean, you haven't questioned, I mean, you have certainly vigorously questioned whether or not the Department of Health is an institutional health care entity, but you really haven't agreed or disagreed, I suppose, in your briefing on the implicit premise of the Department of Health's argument that if the Department of Health is an institutional health care entity, then there would be some inconsistency or tension with the Wellman Amendment. And so my question is, the way that the Wellman Amendment is framed, I thought had addressed really the fundamental funding of the federal government to HHS, noting that there's going to be a prohibition against any funding to a federal entity if it subjects an institutional health care entity, presumably like the Department of Health, according to Oklahoma, to discrimination for the refusal to provide coverage for the referral of abortions. You really haven't questioned that premise. Am I right in assuming that you still don't, that the question for you is, is the Department of Health an institutional health care entity? If that's true, then you lose under the Wellman Amendment? Your Honor, I mean, I think the way that you've described how the Wellman Amendment works, you know, I mean, I think part of what the problem is here is it's been a little bit as the health care entity versus the state or the state, you know, or local government. Sometimes there seems to be a switching back and forth between who we're talking about. I think it's correct that the right way to be thinking about this is that really, you know, the only potential player that we're talking about is the Oklahoma State Department of Health. That's the grantee and that's the one that's distributing funds to the people on the ground who are providing the medical services. And that that's sort of the right level of, you know, we're not talking about money going to HHS. HHS is just distributing the money to grantees. And that money under the Wellman Amendment can't go to, you know, a state or local government that discriminates against health care entities that won't, you know, that won't provide for abortions or for abortions. So I think it's right to be focusing on the Oklahoma State Department of Health, you know, player who potentially is engaged in discrimination. But why can't they do both? Meaning, why can't the Department of Health be the grantee that is receiving the money from HHS? But I just heard Oklahoma say that they're also in partnership, you know, provider to patient direct care out in the counties. It seems in an as applied challenge that we should be focused on not just  they pled this in their complaint to saying that, you know, they're doing direct essentially patient care. I can imagine that would be different potentially for other departments of health and state agencies, but Oklahoma here is, and I heard them just argue this saying that, again, they're engaged in direct patient care. So why can't the grantee here be both one that's, you know, carrying out the services that's the purposes of the grant, but also the one that's dispersing money to others? So, you know, I don't want to get out ahead of the agency too much because as we've discussed, this is all sort of new and we don't have a lot of facts of what's going on on the ground here. I think what Oklahoma has said in its brief is that it's, it's largely operating as an overseer. Some of the state Department of Health employees are the ones who are actually providing the healthcare services and to the extent they are, they may be able to object. And I'm not, you know, I don't think we want to preclude that there might be some grantees who could object. I mean, I think the important step back point that's going on here is just that the way the Weldon Amendment for a long time has worked is that patients are able to get their care from somebody. There may be individuals within the grant program who object and aren't able to perform some of the requirements, but someone else in the program has to be able to. It's never been the case that someone can sort of, you know, nix out entire regulatory requirements by just saying, I'm the grantee and I don't want anybody in my program to perform all these requirements, even if they're willing to do so. Yeah. But here, as you just said, if there's a Oklahoma State Department of Health provider who objects, they're doing so, you know, wearing the hat of the state of Oklahoma. Right. So why would that not be then imputed to the entire grantee or Department of Health is what I understand they're claiming. You know, I'm not sure that it actually will, you know, it might be that an individual employee has a personal belief against doing one of the requirements. And if so, you know, they might have a valid objection. And the same is true as the Weldon Amendment says, you know, certain facilities and organizations, et cetera. But that's the way this normally plays out on the ground is that there's an individual, you know, person or entity that's objecting to performing these requirements. And that's fine so long as someone else can perform the requirements within the umbrella of the project. Yes. Unless there are further questions. I can ask one more. On the third issue under, you know, the arbitrary and capricious, in your response brief you mentioned that, you know, Oklahoma should have just directed any grievances directly to HHS rather than going to the court. But didn't they do that? Your Honor, they didn't do it in the proper way because here what we have is a binding regulation that HHS has issued that I think everybody agrees requires Title X projects to counsel and refer for abortions. And all that HHS did in the decision under review is apply that regulation to Oklahoma. So if Oklahoma thinks that the regulation itself needs to be changed, the right way to bring up that grievance is to go to the agency and petition for rulemaking and say, you need to change your regulation. So it's only the rulemaking aspect of it. It's not the agency action and sort of to implement the rule. In other words, here, you know, once the rule was in place, they joined other states to sue about that rule after the rule was in place. I think it's somewhere in the record to say they also did provide notice and comment when that rule was being contemplated. But really the agency action we're reviewing, as I understand it, under this claim is the decision the agency made, obviously, to rescind the grant that had previously been given. So at that point, though, you know, the way I read the record is they were continuously going back to HHS and sort of communicating that they disagreed with that decision before they filed a lawsuit. So I'm just having a hard time understanding why you say, well, the answer should have been they should have come to us. I mean, what good would that have done, I guess? Your Honor, again, I think really the main problem is that they didn't use any of the formal, you know, procedures to ask the agency to change its rule. The agency has a binding regulation that says that Title X projects are required to provide this neutral factual information. And all that HHS did was apply that regulation. I mean, and I would note, too, that HHS, you know, it wasn't simply that HHS applied that. I mean, it did also release a question and answer document after Dobbs came out where HHS said, you know, we understand that the Supreme Court has said that the states are allowed to regulate abortion. Of course, our requirements about counseling and referral don't entrench on that and remain in effect even after the Supreme Court's decision in Dobbs. I took it that your suggestion that they should go back to the agency and petition for a change was kind of a gratuitous suggestion that here's an easier way to address this. But I didn't think you were arguing formally that that was necessary to preserve the legal arguments for us. Did I miss that? So, Your Honor, I mean, I think it's both. I think really what Oklahoma should have done here is brought this formally to the agency. It should have. I got all that language and I thought that was, well, that's what they should have done. But I didn't catch until maybe just a hint right now that you're saying that when they didn't do that, they are somehow procedurally barred from doing it another way. I didn't. Am I misunderstanding? Are you arguing that strongly or were you just simply saying, look, there was an easier, more amicable way of addressing this problem? Your Honor, I mean, I think the court doesn't have to sort of reach the question. The Supreme Court has said that when there's intervening Supreme Court precedent that might cast doubt on the application of an agency regulation, the right way to bring this about is to go to the right way. But is it the indispensable way? That's the way that Oklahoma is required to bring this up. So you're arguing that until they go to the agency and formally ask for a change in the rule, they are procedurally barred from bringing this in litigation? Is that your argument? Your Honor, I wouldn't call it procedurally barred, but it does bear on what the correct answer is under the arbitrary and capricious question. And here, Your Honor, I mean, I think the important point is even if the court thought that what Oklahoma did here was enough, HHS did specifically, you know, its action was not arbitrary and capricious. It both applied a valid regulation, and it had a back-and-forth where it considered all of the important factors that went into the decision. It might have a special role to play in interlocutory appeal, which is a preliminary kind of an approach, and we have more of an equitable kind of looking at that. Maybe you're simply saying in the weight of equities they had another option so that they aren't quite so hurt under the injury prong as they would be otherwise because they gave up something they could have done. I understand that argument, but if you're looking at it that it's a procedural requirement that they missed and, therefore, they are precluded from making the argument here, I didn't catch it that that was the way it was being presented by you in the briefs, but you're seeming to suggest that now. Your Honor, I read the Supreme Court's decision in Auer v. Robbins to say that the proper procedure in a case like this where there's been an intervening Supreme Court decision that may cast doubt on certain applications of an agency's regulation, that the requirement under the APA is to go to the agency and petition for rulemaking because the agency applies its regulations as written, which is exactly what the agency did here. You think that case said that that was an indispensable step that had to be taken or you have not preserved or exhausted your argument? I think when someone is raising an argument like Oklahoma is raising here that basically the agency should revisit its regulation, the way to bring about that challenge and then to bring it to court is to go to the agency with a petition for rulemaking, and once the agency makes a decision on that petition, then you can challenge that decision in court. Unless there are further questions. Thank you very much. Your Honors, try to move quickly, maybe reverse order. We think that's not a fair reading of the Auer decision that was just being said that a binding Supreme Court decision could come out, but HHS doesn't have to follow it until there's a petition for rulemaking and months and months and years of years of process that occurred. I mean, the Constitution binds, Supreme Court binds immediately. Second, we would say that in terms of the equity of our position that we have now disavowed from the Ohio case, simply that that was not the Health Department's position. The Health Department has taken the Weldon Amendment position now for almost a year, and if anything, it was the Health Department that convinced the Attorney General's office to change their position, and so it is not fair to punish the Health Department's objection because the Attorney General took a position and then has become convinced otherwise, having consulted with the Health Department about what their beliefs on Weldon are. South Dakota v. Dole, the reference in South Dakota v. Dole to regulations we think is a drastic, or administrative directives, is a drastic overreading. It says federal statutory and administrative directives. Now note the word and there. It's not or. It's not you could have one or the other. It's a clear federal statute and administrative directives with that clear condition because Dole is very clear on page 207. If Congress desires to condition, it must do so unambiguously. That's Dole, and the and there cannot be forgotten. I want to really quickly hit on Judge Ebell's point, the all options talk line. I actually went to their website yesterday just because I had that same question in my head, and I looked at it a long time ago. It has a thin veneer of neutrality, but it's very clearly promoting abortion and encouraging abortion. Among other things, there's resources for abortion. There's a Hoosier abortion fund that talks about, and this link, by the way, would have to be in Oklahoma stuff, that talks about how to essentially evade Indiana law and get funding, et cetera, to move out to have abortions. Trainings on abortion and all their press releases are about abortion justice, or most of them are about abortion justice and actually them filing suit against state laws on abortion. Have you made that argument in your briefing, or is there anything in our record that substantiates what you just said? Yes, so we have not made that argument in our briefing, in part because that state law argument is very late blooming here. The government did not make a state law argument below about what exactly does this cut into state law. Well, they certainly argued in their answer brief that the call-in information was offered, was accepted in the 2022-23 grant, and that Oklahoma had approved it and then changed its mind, and they included in the record all of those letters from, I think it's OPM, under HHS, and I didn't see anything saying, yeah, Oklahoma understands that, but Oklahoma rejected or disagrees with, you know, that proposal because it's not a non-directive. It's directive. No, that is correct, Your Honor. That part of it is not in the record. The record does include the link, though. I mean, that's part of the – that's where I found it last night was literally looking through the record and seeing that link and saying, I'm going to go back to that website and look at that. So the link is in the record from when it was filed, so that is there. And to kind of parrot Judge Federico's comments, yes, this was a negotiation and this was not Oklahoma hiding the ball or accepting funding and then trying to kind of commit subterfuge. And, in fact, the record shows that it was literally within seven days of us coming to a definitive decision that we notified HHS. We notified them very quickly after we, you know, basically reached a tentative conclusion but then said, no, we can't do the options talk line. We notified them within seven days. We were not hiding the ball or trying to keep that knowledge from them. We notified them immediately. What if, you know – I mean, we live in a technological era. You know, what if there was an 800 call-in number that was completely non-directive, there was, you know, that the lawyers confer and that there's nothing that encourages abortion, that there's nothing that suggests abortion, that it's truly sort of like – I think, you know, the analogy that I'm thinking of is, you know, we're Oklahomans, no offense, but, you know, the OBA, you know, a lot of times, you know, I need a lawyer, and, you know, I call up you and you say, well, I don't know, call up the Oklahoma Bar Association and they'll tell you the list of all the lawyers that do everything in the state of Oklahoma, and it's going to be – and they're not going to say, you know, call up a Bacharach lawyer or whatever. It's going to be completely non-directive. So if there – it seems fairly easy to create something like this. So if there was something like that that solved the problem with Oklahoma's resistance to take this 2024 grant? It's difficult to say without seeing what the option would look like because the devil is often in the details, and I don't – you know, obviously in this case the health department tried to propose just sending them to the federal government as a compromise option, and that was rejected. The details of a specific option beyond that, it's very difficult to say, again, because we'd almost have to see the details. Well, the reason I ask – I mean, I'm not trying to settle your lawsuit, but, you know, the whole point, say, of the Wilder amendment is referral for abortion. You know, you took issue with, you know, the language in the termination notice about, you know, that this was – that they agreed not to, you know, to require a referral for abortion. And so if there's a truly non-directive call-in number or whatever, you know, my question to you is, well, would that be – you know, for means something. Yeah. You know, forget the verb referral or a noun, but for means something. You want a referral about abortion, referral concerning abortion, referral as to abortion, referral for abortion. And so my question is, if it was truly non-directive, maybe you didn't like this particular verbiage, but if it was truly non-directive, how could that be considered a referral for an abortion? I think the way it would be considered potentially a referral for abortion, again, depending on the details, would be simply the connecting – since abortion is verboten in Oklahoma, connecting them with somebody, knowing that that person in that – you know, even if it's non-directive, is going to give them the information exactly if they ask for it, where and when and how to do something that is verboten under Oklahoma law. That kind of goes back to my question. The record doesn't – I don't think, unless I missed it – I did miss it if it were just in the record because I focus on the briefing, but does the record give us a transcript of what you would get in that action phone call? No, there's no transcript. Who are you speculating about all of that? Who is? If you're asking us to make a ruling based upon whether the referral is to a directed agency or a non-directed agency, the record is agnostic. It's represented to be a non-directed agency, and that was sufficient for Oklahoma for a long time. It was sufficient for Oklahoma until Dobbs brought back into play a very robust abortion ban. But even before Dobbs, you still had this language about referring for adoption, not referring – I mean, it doesn't say referring about, but as Judge Bacharach said, it says refer for. I think that is an advocacy position rather than an about, which is an informational position. Potentially. I mean, again, kind of going back to Judge Bacharach's example, we have not – we don't advocate in this case, even in Oklahoma, that somebody giving truly neutral information in terms of is abortion legal in Oklahoma? No. Well, that wouldn't be – Well, it would have been hypothetical. For a pregnant woman, what are the options that are available? Yes. And somebody says, okay, well, there's this option. Just like if you call the LVA number, you know, what are the options? Well, you can mediate, you can arbitrate, and you can litigate. You know? So if you call up an 800 number and they say, you know, if you're a pregnant woman, what are your options? Well, you can – there's something called abortion. There's something called, you know, da-da-da-da-da. These are all your options. If you want an obstetrician, this is the number to call. You know? There's nothing for. You're not referring, you know, work by an obstetrician any more than you're referring, you know, referring something, you know, for litigation to give the name of a lawyer. You know? So that's kind of what I just follow up to judge. No, I understand, but as we've stated in our reply, we think that there's a big difference between saying here's the options in Oklahoma and then having to say there's an option outside of Oklahoma that Oklahoma public policy and law completely disagrees with, like the suicide option we gave. We don't think that a state would or should be forced to, and we do think it would be considered at least some form of promotion or advocacy, even very limited, to tell a suicidal person, oh, one of your options is to commit suicide up in a different state that has assisted suicide. We think that would be, if you're listing that as an option to the person in the state, it is saying that is a valid and legitimate option to go get, and Oklahoma law says that's not. And, ergo, we think that under Oklahoma law it is arguably promoting or encouraging abortion, and that's the position that defendants have taken at least twice in the past 40 years, that abortion referrals are promoting or encouraging abortion. That's something that they've flipped on several times over the past 40 years, and we understand that's not their position now, but it makes it at least arguable or it's reasonable to see that if you're giving somebody that option from out of state to do something such as drastic here as Oklahoma believes, that it is ending the life of an unborn child, and I'm going to tell you that option is legitimate and can be had out of state, we believe that that would cross the line between promoting and encouraging. Do you have any questions? Thank you. This has been submitted. I did want to express appreciation for both sides for your zealous advocacy and your excellent advocacy in your briefs and in your arguments today, and I appreciate your patience in fielding all of our, my particularly, many questions, and I hope you don't feel like you didn't get to say what you came to say, but I so appreciate your excellent answers to questions. I do want to just make one sort of comment. We haven't conferenced about it, obviously. You have a pending motion to expedite. We haven't technically ruled on it. I hope it's fairly evident to everybody, particularly in light of this setting that we made, that this is not something that we have overlooked, and we are very conscious of both sides wanting an expeditious determination. I know that you have asked for July 15th for a decision, and you, I think, shared in that, and so I just want you to know that both sides know that we're going to try our best, and we certainly appreciate the necessity of expeditious consideration. Court is adjourned.